FILED
2021 Apr-09  PM 05:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **TOMMY HITCHCOCK,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  5:19-cv-01573-MHH** |
| | } | |
| **ANDREW SAUL,** | } | |
| **Commissioner of the** | } | |
| **Social Security Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Tommy Hitchcock has asked the Court to review a final adverse decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).  After review, the Court affirms the Commissioner's decision.

### Procedural Background

Mr. Hitchcock applied for a period of disability and disability insurance benefits on September 17, 2015, alleging that his disability began on December 15, 2014.  (Doc. 5-6, p. 2).  The Commissioner denied his claim on October 22, 2015, and Mr. Hitchcock requested a hearing before an Administrative Law Judge (ALJ).  (Doc. 5-3, p. 12).   The ALJ issued an unfavorable decision on August 17, 2018.  (Doc. 5-3, p. 9).  The Appeals Council declined Mr. Hitchcock's request for review

1

(Doc. 5-3, p. 2), making the Commissioner's administrative decision final for this Court's judicial review.  *See* 42 U.S.C. § 405(g).

## Standard of Review

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510–11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ.  *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted).  If substantial evidence supports the ALJ's factual findings, then the district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If the district court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

### Statutory and Regulatory Framework

To be eligible for disability benefits, a claimant must be disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin*, 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)). A claimant must prove that he is disabled. *Gaskin*, 533 Fed. Appx. at 930 (citing *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003)).

To determine whether a claimant has established that he is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ must consider:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past

relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.  "The claimant has the burden of proof with respect to the first four steps."  *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136–37 (11th Cir. 2009).  "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

### The Administrative Law Judge's Findings

The ALJ found that Mr. Hitchcock had not engaged in substantial gainful activity since December 15, 2014, the alleged onset date.  (Doc. 5-3, p. 14).  The ALJ determined that Mr. Hitchcock suffered from the following severe impairments: obesity, arthritis in the knees and feet, and disorder of muscle.  (Doc. 5-3, p. 15). The ALJ also determined that Mr. Hitchcock had a history of depression that was non-severe.  (Doc. 5-3, p. 15).  Based on a review of the medical evidence, the ALJ concluded that Mr. Hitchcock did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Doc. 5-3, p. 16).[1]

---

[1] The regulations governing the types of evidence that a claimant may present in support of his application for benefits or that the Commissioner may obtain concerning an application and the way in which the Commissioner must assess that evidence changed in March of 2017.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence; Correction, 82 Fed. Reg. 15,132 (Mar. 27, 2017).  Because Mr. Hitchcock filed his application for benefits before March

Given Mr. Hitchcock's impairments, the ALJ evaluated Mr. Hitchcock's residual functional capacity.  The ALJ determined that Mr. Hitchcock had the RFC to perform:

> less than the full range of sedentary work as defined in 20 CFR 404.1567(a) except occasionally lift up to ten pounds while sitting and with the use of a cane to carry/lift ten pounds; stand and/or walk, for a total of three hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; no limitations in gross and/or fine handling; use of foot controls limited to occasionally; occasionally climb ramps and stairs with handrail; occasionally balance, stoop, kneel, and crouch; no crawling; avoid concentrated exposure to cold, heat, wetness, and humidity; no work at unprotected heights or around dangerous, moving machinery.

(Doc. 5-3, p. 18).  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

Based on this RFC, the ALJ concluded that Mr. Hitchcock could not perform his past relevant work as an order filler or as an industrial cleaner/janitor.  (Doc. 5-3, p. 22).  Relying on testimony from a vocational expert, the ALJ found that jobs existed in the national economy that Mr. Hitchcock could perform, including an

---

27, 2017, the new regulations, found at 20 C.F.R. §§ 416.913 and 416.920c, do not apply to his case.  *See Morgan v. Comm'r of Soc. Sec.*, 760 Fed. Appx. 908, 911 n.2 (11th Cir. 2019).

assembler (*Dictionary of Occupational Titles* No. 713.687-018), an inspector (*Dictionary of Occupational Titles* No. 739.687-182), and a parts grader (*Dictionary of Occupational Titles* No. 735.687-022). (Doc. 5-3, p. 23). Accordingly, the ALJ determined that Mr. Hitchcock was not under a disability within the meaning of the Social Security Act. (Doc. 5-3, p. 23).

## The Evidence

### *Mr. Hitchcock's Medical Records*

#### <u>Auditory</u>

On September 15, 1981, Mr. Murphree, an audiologist at the Hearing & Speech Clinic in Huntsville, Alabama wrote a report about Mr. Hitchcock's audiological evaluation.   (Doc. 5-12, p. 5).   Mr. Murphree explained that Mr. Hitchcock had his audiological evaluation on September 3 and returned for verification of the results on September 11.   (Doc. 5-12, p. 5).   He was evaluated because his mother "was concerned about possible hearing loss.   She noted that Tommy's father and aunt had hearing loss, that Tommy's speech and language seemed delayed, and that he appeared to miss some sounds around the house."   (Doc. 5-12, p. 5).   Mr. Murphree noted the following impressions:

> Testing on both occassions [*sic*] yielded consistent results.   The right ear is borderline normal low 250 and 500Hz, sloping to a mild sensori-neural loss through 2000Hz, and a moderate to severe sensori-neural hearing loss in the higher frequencies.   The left ear is slightly poorer in the low frequencies, symmetrical in the highs.   Speech discrimination is fair to good bilaterally.

6

(Doc. 5-12, p. 5).  Mr. Murphree recommended that Mr. Hitchcock have "binaural amplification; he needs to return for a hearing aid evaluation."  (Doc. 5-12, p. 5). Mr. Hitchcock also needed a speech and language evaluation.  (Doc. 5-12, p. 5).  Mr. Hitchcock returned for the hearing aid evaluation on September 22, 1981, and Mr. Murphree recommended Mr. Hitchcock "obtain a Telex 341H (Binaural) hearing aid."  (Doc. 5-12, p. 7).[2]

On October 2, 1985, when he was nine years old, Mr. Hitchcock had another auditory evaluation at the Hearing & Speech Clinic.  (Doc. 5-11, p. 56).  Mr. Murphree noted in the audiometric speech summary that Mr. Hitchcock's right ear had a word recognition score of 88%, while the left ear had a recognition score of 92%.  (Doc. 5-11, p. 56).  On August 16, 1991, when he was 15 years old, Mr. Hitchcock's auditory evaluation showed a recognition score of 72% in his right ear and 60% in his left ear.  (Doc. 5-11, p. 55).

On April 13, 2016, Mr. Hitchcock visited Blossomwood Medical, where Dr. Melissa DeBerry examined him.  (Doc. 5-8, pp. 66–69).  Dr. DeBerry noted that Mr. Hitchcock had "[g]rossly normal hearing."  (Doc. 5-8, p. 67).  During an August 22, 2016 follow-up appointment, Dr. DeBerry again noted that Mr. Hitchcock had

---

[2] While not medical evidence, the Court notes that when Mr. Hitchcock was in fourth grade, in May 1987, his teacher recommended that Mr. Hitchcock receive "preferential seating in [the] classroom to compensate for [his] hearing impairment."  (Doc. 5-11, p. 43).  The administrative record includes other notes from schoolteachers concerned about Mr. Hitchcock's speech and hearing problems in class.  (*See* Doc. 5-11, pp. 40, 43, 44).

"[g]rossly normal hearing." (Doc. 5-8, p. 71). On December 2, 2016, Mr. Hitchcock visited Dr. Vijay Jampala for a rheumatology consultation. (Doc. 5-9, pp. 16–17). Mr. Hitchcock denied having hearing problems. (Doc. 5-9, p. 16).

<u>Intellectual Disability</u>

On April 11, 1990, when he was 14 years old, Scottsboro Junior High School administered to Mr. Hitchcock an Otis-Lennon School Ability Test (OLSAT). (Doc. 5-11, p. 7). The OLSAT "is a group administered test of students' ability to cope with school learning tasks. Its age-normed Verbal Score, Nonverbal Score and Total School Ability Index (SAI) each have a mean of 100 and standard deviation (SD) of 16." A. Lynne Beal, *A Comparison of WISC-III and OLSAT-6 for the Identification of Gifted Students*, 11 CANADIAN JOURNAL OF SCHOOL PSYCHOLOGY, no. 2, 120, 123 (1996).[3] Mr. Hitchcock received an SAI score of 76: 75 for verbal and 80 for non-verbal. (Doc. 5-11, p. 7). One year later, on April 11, 1991, when he was 15 years old, Mr. Hitchcock received an SAI score of 50: 50 for verbal and 51 for non-verbal. (Doc. 5-11, p. 7).

---

[3] The OLSAT is not an IQ test. *See, e.g.*, *Pruitt v. Neal*, 788 F.3d 248, 253 (7th Cir. 2015) (explaining the OLSAT is an "academic achievement test[]" and an OLSAT score is "not given as an IQ score."); *Williams v. Colvin*, No. 4:14-CV-40-FL, 2015 WL 73818, at *5 (E.D.N.C. Jan. 6, 2015) (comparing social security applicant's IQ score and OLSAT score); OLSAT8, ASSESSMENT RESOURCE CENTER, UNIVERSITY OF MISSOURI, https://arc.missouri.edu/olsat8/ (last visited Mar. 29, 2021) ("The Otis-Lennon School Ability Test . . . assesses student thinking skills and provides an understanding of a student's relative strengths and weaknesses in performing reasoning tasks.").

On February 5, 2018, Mr. Hitchcock was admitted to Huntsville Hospital. (Doc. 5-15, p. 50). Dr. Tarak Vasavada noted that Mr. Hitchcock was "low IQ" and had a "borderline IQ." (Doc. 5-15, p. 55).

*Obesity*

Mr. Hitchcock is obese. On November 16, 2016, Mr. Hitchcock weighed 375 pounds and was 6' 2" tall. (Doc. 5-9, p. 5). His body mass index was 48.1; a BMI of 30.0 and above is considered obese.[4] According to the Centers for Disease Control and Prevention, a "normal weight range" for Mr. Hitchcock would be between 144 and 194 pounds. On March 7, 2017, Mr. Hitchcock weighed 419.2 pounds, and his BMI was 58.5. (Doc. 5-9, p. 20). And on April 17, 2017, Mr. Hitchcock weighed 416 pounds. (Doc. 5-10, p. 52).

*Knee, Ankle, and Foot Pain*

On December 1, 2014, Mr. Hitchcock presented at SportsMED Orthopaedic Surgery & Spine center complaining of bilateral foot pain. (Doc. 5-12, p. 23). Dr. Garcia Cardona observed that Mr. Hitchcock had not tried conservative management of his foot pain and that the pain was worse with activity but improved somewhat with rest. (Doc. 5-12, p. 23). Dr. Garcia Cardona examined Mr. Hitchcock and found "[t]enderness to palpation along the sinus Tarsi as well as the talonavicular

---

[4] *See* ADULT BMI CALCULATOR, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calcul ator.html (last visited Mar. 31, 2021).

joint.  His findings are bilateral.  Neurovascular exam is intact.  Upon standing

hindfoot is in valgus with complete flattening of the arch."  (Doc. 5-12, p. 24).  An

x-ray revealed "End-stage arthritis of the hindfoot bilaterally."  (Doc. 5-12, p. 24).

Dr. Garcia Cardona recommended that Mr. Hitchcock use an "Arizona brace for his

left ankle and foot."  (Doc. 5-12, p. 25).  During a December 29, 2014 follow-up

appointment, Dr. Garcia Cardona noted that Mr. Hitchcock had "bilateral posterior

tibial tendon dysfunction stage III."  (Doc. 5-12, p. 26).

During his February 2, 2015 follow-up, Mr. Hitchcock reported a recent injury

to his left knee which led to pain and swelling.  (Doc. 5-12, p. 28).  Dr. Garcia

Cardona observed "[s]welling and tenderness to palpation around the left knee.

Some popping is noted.  Bilateral tenderness to palpation at the sinus Tarsi as well

as the talonavicular joint and calcaneocuboid joints."  (Doc. 5-12, p. 29).  Dr. Garcia

Cardona ordered an MRI of Mr. Hitchcock's knee, and instructed him to follow up

with Dr. Culpepper within a week to discuss the MRI results.  (Doc. 5-12, p. 30).

On February 16, 2015, Dr. Raymond Armstrong, a radiologist, read an MRI

of Mr. Hitchcock's left knee.  (Doc. 5-12, p. 51).  Dr. Armstrong found:

> Tricompartment degenerative arthrosis predominates at the patellofemoral joint compartment.  There is joint space, chondromalacia, and subchondral cyst formation which is well illustrated on axial image 12.
>
> A moderate-sized knee joint effusion is present, and a small Baker's type popliteal fossa cyst extends between the medial head of the gastrocnemius and the semimembranosus.

> The quadriceps tendon, patellar tendon, ACL, PCL, medial collateral, and lateral collateral ligaments are intact. The medial and lateral meniscus do not appear torn.

(Doc. 5-12, p. 51). Dr. Armstrong made three findings: "(1) Moderate tricompartment degenerative arthrosis predominating at the patellofemoral joint compartment. (2) Moderate-sized left knee joint effusion with a small Baker's type popliteal fossa cyst. (3) No ligamentous, tendinous, or meniscal tear." (Doc. 5-12, p. 51).

On February 18, 2015, Dr. Dale Culpepper evaluated Mr. Hitchcock at SportsMED. (Doc. 5-8, pp. 27–29). Mr. Hitchcock presented:

> for evaluation of left knee pain. He has had some mild pain over the last years. In the last 2 months he has had more severe pain in the left knee. He was treated with a course of prednisone and is now taking meloxicam with minimal improvement. He has been wearing a brace on the knee. He has pain somewhat diffusely in the knee. Pain is aggravated by walking and other activities. He is having to use a cane to ambulate.

(Doc. 5-8, p. 27). On examination, Dr. Culpepper noted that Mr. Hitchcock's "[l]eft knee shows a mild effusion. He has tenderness diffusely about the entire knee. He has pain on movement of the knee. Movement has 0-100° with pain. Ligamentous exam is stable. Neurovascular exam to the leg is normal." (Doc. 5-8, p. 28). Dr. Culpepper reviewed x-rays and an MRI of Mr. Hitchcock's knee "which show osteoarthritis changes," but the MRI did "not show any meniscal tears." (Doc. 5-8, p. 28). Dr. Culpepper injected Mr. Hitchcock's knee with cortisone and prescribed

11

home rehabilitation exercises.  (Doc. 5-8, p. 28).  Dr. Culpepper indicated that Mr.

Hitchcock needed to "work on a weight loss program."  He also commented:

> He normally stands and walks all day long at work.  He reports [he] is
> not allowed to work with a cane.  I think he will need to stay off work
> for at least the next week or 2.  He can try to return to work as pain
> permits.  He also has the ankle problem that Dr. Garcia is seeing him
> for.

 (Doc. 5-8, p. 28).

Mr. Hitchcock returned to SportsMED on February 27, 2015 for a follow-up

appointment for the osteoarthritis of his left knee.  (Doc. 5-8, pp. 25–26).  Dr.

Culpepper noted that Mr. Hitchcock had taken anti-inflammatory medication with

no improvement, that the February 18 cortisone shot resulted in "only slight

improvement," and that Mr. Hitchcock was "walking with a cane and a slight

[limp]."  (Doc. 5-8, pp. 25-26).  Dr. Culpepper explained:

> Unfortunately we do not have any other good option for this.  I think he
> is too young to consider total knee replacement at this point.  He is also
> overweight.  He is going to continue with the home exercises.  He has
> not been able to return to work for long periods of standing and
> walking.  I think he needs to be limited to light duty work with limited
> standing and walking.  He'll return to see us as needed.

(Doc. 5-8, p. 26).

On March 30, 2015, Dr. Garcia prescribed a brace for Mr. Hitchcock's right

knee, and she gave Mr. Hitchcock meloxicam and tramadol.  (Doc. 5-8, p. 24; Doc.

5-12, p. 37).  When Mr. Hitchcock saw Dr. Culpepper in April of 2015, Mr.

Hitchcock was walking with a limp and using a cane and knee brace.  (Doc. 5-8, pp. 21-22).

Mr. Hitchcock saw Dr. Culpepper at SportsMED on April 28, 2015.  Dr. Culpepper explained that Mr. Hitchcock "had previous x-rays and MRI scan of his left knee which showed osteoarthritis changes.  He also has pain in his right knee. We have injected the left knee several months ago that helped temporarily.  He continues to have pain in both knees.  The pain is worse on the left side.  He is using a cane and a brace."   (Doc. 5-12, p. 39).  Dr. Culpepper x-rayed Mr. Hitchcock's right knee and found osteoarthritis changes "similar to his previous x-rays of the left knee."  Dr. Culpepper recommended that Mr. Hitchcock continue taking Mobic and work on weight loss.  (Doc. 5-12, pp. 40-41).

On May 22, 2015, Dr. Bobby Newbell evaluated Mr. Hitchcock, and, based on a physical examination, stated that Mr. Hitchcock was "to use cane for ambulation and [l]eft knee brace."  (Doc. 5-8, p. 6).  Dr. Newbell noted a patch of skin on Mr. Hitchcock's right shin that suggested that Mr. Hitchcock might have psioratic arthritis.  (Doc. 5-8, p. 6).  During an October 14, 2015 follow-up appointment, Dr. Culpepper noted Mr. Hitchcock was using a cane to walk and that he had "some mild edema in both legs." (Doc. 5-12, p. 48).  Dr. Culpepper repeated his impression that there were no other treatment options for Mr. Hitchcock.  (Doc. 5-12, p. 48).

Mr. Hitchcock visited SportsMED on July 13, 2015.  Dr. Culpepper explained that Mr. Hitchcock had osteoarthritis in both knees and chronic swelling in his legs. Dr. Culpepper wrote:  "He is still having [to] use a case to ambulate.  He uses a brace on the left side."  (Doc. 5-12, p. 45).  Dr. Culpepper's physical examination was consistent with prior examinations.  He discussed treatment options with Mr. Hitchcock and stated:  "We will continue with conservative management.  He is working on a weight loss program.  He has not been able to return to his work.  He would have permanent restrictions on prolonged standing or walking and light duty work."  (Doc. 5-12, p. 46).  On July 13, 2015, Dr. Culpepper issued a work release, indicating that Mr. Hitchcock was discharged from treatment and stating:  "This patient has osteoarthritis in both knees and is restricted to light duty work.  No prolonged walking, standing or stairs."  (Doc. 5-12, p. 44).

Mr. Hitchcock visited SportsMED on October 14, 2015.  Dr. Culpepper explained that he had seen Mr. Hitchcock "several times in the last 6 months with bilateral knee pain.  Left side is worse.  X-rays had shown osteoarthritis changes on both knees he has been treated conservatively and still has pain in the left knee.  He reports he is scheduled to start a water therapy program."  (Doc. 5-12, p. 47).  Based on his physical exam of Mr. Hitchcock, Dr. Culpepper noted that Mr. Hitchcock could move "0-120° with pain," and he had "a psoriatic type rash" on his leg.  (Doc. 5-12, p. 48).  Dr. Culpepper wrote:  "Unfortunately we do not have any other

14

treatment options.  We have recommended the importance of a weight loss program.  He will continue with rehabilitation exercise program.  He is using the brace and the cane."  (Doc. 5-12, p. 48).

Mr. Hitchcock visited Blossomwood Medical on April 13, 2016 "to establish care."  (Doc. 5-8, p. 66).  Dr. DeBerry evaluated Mr. Hitchcock.  (Doc. 5-8, p. 66).  She noted that he had "OA in both knees and other sites.  He denies having other medical problems but needs a PCP."  (Doc. 5-8, p. 66).  Concerning Mr. Hitchcock's generalized osteoarthritis, Dr. DeBerry noted:  "Pain is moderate in intensity.  Pain is dull, constant in severity.  Resting make[s] it worse."  (Doc. 5-8, p. 66).  She noted his medical history of anxiety, depression, arthritis, and gout.  (Doc. 5-8, p. 66).  Mr. Hitchcock displayed a normal gait and station.  (Doc. 5-8, p. 67).  Dr. DeBerry recommended at least 30 minutes of exercise 5-6 days per week.  (Doc. 5-8, p. 68).

Mr. Hitchcock returned to Blossomwood on August 22, 2016.  (Doc. 5-8, p. 70).  He presented:

> with complaints of severe LUE pain.  He states the pain has become more intense in the past 3 days.  The pain is constant and sharp; it is centered in his elbow and radites [*sic*] up his left shoulder and into back of neck and down into his hand.  The elbow and hand are swollen and elbow is red.  He has been having pain in several joints for the past couple of months.  The pain is located in a different joint at different times, always moving around.  The pain gets worse when he lays down for awhile.  None of his other joints hurt as bad as the left elbow, though.  He reports he has been trying to learn to use the computer and spent a lot of time keyboarding during the 5 days before the pain started.

(Doc. 5-8, p. 70).

15

Mr. Hitchcock saw Dr. Culpepper on April 25, 2016.  Mr. Hitchcock reported that his knee pain was improved, and he had lost 30 pounds.  (Doc. 5-12, p. 49).  Dr. Culpepper observed that Mr. Hitchcock was walking with a slight limp.  (Doc. 5-12, p. 50).  Dr. Culpepper diagnosed left knee osteoarthritis.  He recommended that Mr. Hitchcock try a stationary bike for exercise.  (Doc. 5-12, p. 50).

On November 16, 2016, Mr. Hitchcock saw Dr. Davis at The Orthopaedic Center.  Mr. Hitchcock complained of joint pain and explained that he had trouble getting up if he fell off the couch.  He reported that he had not left his house since August.  He reported sharp pain in his elbow when he performed daily activities of living "but otherwise it can be a dull achy sensation in the left elbow down to the wrist and in some multiple joints."  (Doc. 5-9, p. 3).  A physical examination of his left arm revealed some stiffness and "somewhat diminished [] grip strength on the left compared to the right secondary to the pain," but there was "no evidence of instability."  (Doc. 5-9, p. 4).  Mr. Hitchcock also displayed "mild stiffness with active range of motion" in his left wrist.  (Doc. 5-9, p. 4).  Dr. Davis referred Mr. Hitchcock to a rheumatologist.  (Doc. 5-9, p. 4).

On December 2, 2016, Dr. Jampala, a rheumatologist, evaluated Mr. Hitchcock.  (Doc. 5-9, p. 17).  Mr. Hitchcock reported that he had been "on long-term disability through work for past two years."  (Doc. 5-9, p. 16).  Dr. Jampala noted that Mr. Hitchcock:

> was having ongoing knee pain with swelling and was using a cane to walk around and his employer said he needs to go on disability; he cannot work with cane in the plant, so he is now on long term disability. He is still waiting to apply for social security disability. Patient has gout for long time. He has knee pain and ankle pain for more than 10 years.

(Doc. 5-9, p. 16).  Mr. Hitchcock reported that he left his house only to see doctors because he was afraid of falling.  (Doc. 5-9, p. 16).  Dr. Jampala observed "[b]oth hips, both knees and ankle exam limited but no evidence of any swelling in the knees. No warmth, no local tenderness.  Patella exam is normal.  No deformity of the knees. To exam both sides normal.  No swelling, no deformities, no tenderness.  Gait is normal."  (Doc. 5-9, p. 17).

On March 7, 2017, Mr. Hitchcock presented to Blossomwood Medical "requesting to be referred to a physician who performs disability evaluations." (Doc. 5-9, p. 19).  Dr. Vytautas Pukis evaluated Mr. Hitchcock.  (Doc. 5-9, p. 19).  Mr. Hitchcock complained of "pain in multiple joints, mainly his knees and ankles.  Pain is moderate to severe in intensity.  Pain is dull, constant in severity.  Movement makes the pain worse."  (Doc. 5-9, p. 19).  Dr. Pukis advised Mr. Hitchcock to remain physically active, and Dr. Pukis referred Mr. Hitchcock to a rheumatologist. (Doc. 5-9, p. 21).  Mr. Hitchcock's depression was in remission, but he was experiencing anxiety.  (Doc. 5-9, p. 21).

17

A May 9, 2017 x-ray of Mr. Hitchcock's knees was conducted by Dr. Deepak Sree at Rheumatology Associates of Northern Alabama.  (Doc. 5-10, p. 13).  The x-ray showed "degenerative changes bilaterally, mostly in the medial and patellofemoral compartments bilaterally.  No erosive change is seen.  No fractures or other abnormalities noted."  (Doc. 5-10, p. 13).

***Mr. Hitchcock's Administrative Hearing Testimony***

Mr. Hitchcock's administrative hearing took place on June 15, 2018.  (Doc. 5-3, p. 44).  Mr. Hitchcock testified that he had not looked for work because he did not "know what's out there.  And I'm not too good on computers."  (Doc. 5-3, pp. 52–53).

Mr. Hitchcock testified that he weighed over 400 pounds and that he had gained over 100 pounds since December 2014 because he was an emotional eater.  (Doc. 5-3, pp. 55–56).  He explained that he had been on long-term disability for two years, but his benefits had expired.  (Doc. 5-3, pp. 54-55).  He had no insurance, and he could not afford medical treatment.  (Doc. 5-3, p. 56).  Mr. Hitchcock was nervous to do things because he was afraid he would fall; his knees gave out and his weight put pressure on his knees.  (Doc. 5-3, pp. 56–57).  He testified that since he had stopped working, he had fallen six times.  (Doc. 5-3, p. 57).  Mr. Hitchcock described his knee pain as jagged and rated it a nine or ten "most of the time."  (Doc. 5-3, p. 58).  He said:  "now everything's just harder to do."  (Doc. 5-3, p. 57).  He

explained that whenever he stood, he used a cane, both inside and outside the house. (Doc. 5-3, p. 60).  Pain caused Mr. Hitchcock to lay down about every two hours to rest for between 30 minutes and an hour.  (Doc. 5-3, p. 62).  Mr. Hitchcock testified that pain in his feet made it difficult to walk and sometimes difficult "to put on a tennis shoe."  (Doc. 5-3, pp. 59–60).  He rated his foot pain "[n]ine to ten."  (Doc. 5-3, p. 60).  Mr. Hitchcock stated that he took only aspirin and Tylenol for pain because he could not afford medication.  (Doc. 5-3, p. 61).  Mr. Hitchcock had not driven a car in two years because pain prevented him from pressing the brake in a car, and he was afraid he would kill someone if he drove.  (Doc. 5-3, p. 63).

Mr. Hitchcock testified about arthritis in multiple joints in his hands.  (Doc. 5-3, p. 65).  He said that it was "hard to hold even a can of Pepsi or can of anything; open a jar; hold a pencil to write," and that he experienced pain and numbness in his hands.  (Doc. 5-3, p. 65).  When his hands were elevated at table level, they would go numb within 15 to 20 minutes.  (Doc. 5-3, p. 67).  Mr. Hitchcock tried learning to type on a computer, but within 10 or 20 minutes his hands would go numb.  (Doc. 5-3, p. 68).

Mr. Hitchcock testified that he had had deafness since he was a child.  (Doc. 5-3, p. 69).  He explained that he "don't hear what other people are say.  I don't hear what other things are doing.  You miss out on a lot of stuff.  And then the way people treat you, you just don't want to be around people."  (Doc. 5-3, p. 69).  When he was

19

working, Mr. Hitchcock had trouble hearing noises in the plant and doing janitorial work.  (Doc. 5-3, p. 69).

The ALJ took testimony from John McKinney, an impartial vocational expert. (Doc. 5-3, p. 83).  Mr. McKinney testified that he had reviewed Mr. Hitchcock's work background, including his work as an order filler (*Dictionary of Occupational Titles* No. 922.687-058) and an industrial cleaner or janitor (*Dictionary of Occupational Titles* No. 381.687-018).  (Doc. 5-3, p. 84).  The ALJ presented the following hypothetical to the vocational expert:

> I'd like you to assume a hypothetical individual with the age, education, prior work history and training of [Mr. Hitchcock].  We'll limit the hypothetical to light work, where the hypothetical individual can occasionally lift and/or carry, pulling of 20 pounds, occasionally up to one-third of an eight-hour workday; frequently lift and/or carry, pulling of 10 pounds, but frequently, up to two-third of an eight-hour workday. Hypothetical individual could sit six hours in a eight-hour workday, with all customary work breaks.
>
> Standing and walking would be limited to four hours in an eight-hour workday, no greater than 30 minutes at one time, with the ability to sit and change positions.  Hypothetical individual can occasionally climb ramps and stairs with a rail; occasionally balance, stoop, kneel, crouch; but no crawling; no ladders, ropes or scaffolds.  Hypothetical individual can avoid concentrated exposure to extreme cold and heat, wetness and humidity; no heavy vibratory type of job; no work around dangerous, moving machinery or at unprotected heights.
>
> If we had that hypothetical individual, could that hypothetical individual return to any of [Mr. Hitchcock's] prior work?

(Doc. 5-3, pp. 84–85).  The vocational expert said that no, the hypothetical individual could not return to Mr. Hitchcock's prior work, but there were light, unskilled jobs

that he could perform. (Doc. 5-3, p. 85). These included a garment folder (*Dictionary of Occupational Titles* No. 789.687-066); a hand packager (*Dictionary of Occupational Titles* No. 753.687-038); and an inspector (*Dictionary of Occupational Titles* No. 723.687-014). (Doc. 5-3, p. 85).

The ALJ asked a second hypothetical:

[A]ssume the hypothetical individual can understand, remember, carry out simple instructions; concentrate and stay on task for these simple instructions for two-hour periods, across an eight-hour workday, five-day work week, with all customary work breaks. Hypothetical individual should have only occasional contact with the general public, co-workers, and supervisors. If we had those nonexertional limitations of those, would that alter your opinion about the jobs you just listed?

(Doc. 5-3, pp. 85–86). The vocational expert said no, these limitations would not alter his opinion. (Doc. 5-3, p. 86). The ALJ asked a third hypothetical:

[L]imit the hypothetical individual to sedentary work. Hypothetical can occasionally lift up to ten pounds while sitting; with the use of a cane, can carry and lift ten pounds; standing and walking would be limited to three hours in an eight-hour workday; sitting six hours in an eight-hour workday. There's no limitation of extremes of gross/fine handling. Use of foot controls, only, would be limited to occasional; occasionally climbing ramps and stairs, with a rail; occasionally balance, stoop, kneel, crouch; but no crawling.

And avoid -- environmental limitations, avoid concentrated exposure to extreme cold and heat, wetness, humidity. No work at unprotected heights or around dangerous, moving machinery. Would there be any sedentary type unskilled jobs that hypothetical individual could perform? And if so, would you give us representative examples?

(Doc. 5-3, p. 86). The vocational expert provided several sedentary, unskilled jobs with an SVP of 2: assembler (*Dictionary of Occupational Titles* No. 713.687-018);

inspector (*Dictionary of Occupational Titles* No. 739.687-182); and parts grader (*Dictionary of Occupational Titles* No. 735.687-022).  (Doc. 5-3, pp. 86–87).  In a fourth hypothetical, the ALJ asked the vocational expert "if we limit -- same limitations as expressed in hypothetical number 2, but we limit the hypothetical individual to frequent use of the upper extremities and hands, and can use his hands to grasp silverware -- forks, spoons -- [inaudible], and it would limit it to frequent, would that alter your opinion regarding the sedentary jobs you had previously listed?"  (Doc. 5-3, pp. 87–88).  The vocational expert said that no, the added limitation would not alter his opinion.  (Doc. 5-3, p. 88).

## Analysis

Mr. Hitchcock argues that he is entitled to relief from the ALJ's decision because the ALJ refused his request for consultative examinations, one for hearing loss and one for IQ testing, and because the ALJ did not properly evaluate his medical conditions under Listing 1.02 or obtain the necessary medical opinions regarding Listing 1.02.  (Doc. 10-1, p. 9).  We consider each argument in turn.

### The ALJ's Decision Not to Order an Audiological or IQ Examination

"Social Security proceedings are inquisitorial rather than adversarial.  It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits . . . ."  *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000) (citing

*Richardson v. Perales*, 402 U.S. 389, 400–01 (1971)).[5]  "Even though Social Security courts are inquisitorial, not adversarial, in nature, claimants must establish that they are eligible for benefits.  The administrative law judge has a duty to develop the record where appropriate but is not required to order a consultative examination as long as the record contains sufficient evidence for the administrative law judge to make an informed decision."  *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1269 (11th Cir. 2007) (citing *Doughty v. Apfel*, 245 F.3d 1274, 1281 (11th Cir. 2001); *see also Holladay v. Bowen*, 848 F.2d 1206, 1210 (11th Cir. 1988) (the ALJ "is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the administrative law judge to render a decision.").

The ALJ denied Mr. Hitchcock's request for a consultative audio examination, finding that an examination was not necessary "to render a full and fair decision."  The ALJ stated:

> The records of his treating physicians, Dr. DeBerry, Dr. Jampala, and Dr. Pukis do not support the claimant's allegations of hearing loss. Those records clearly do not show the claimant had any hearing or communication problems.  Furthermore, at the hearing on June 15, 2018, the undersigned observed the claimant was able to hear and respond, to each question asked both from the undersigned and his

_____

[5] *See also Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1356 (11th Cir. 2018) ("Few, if any, agency adjudications depart more markedly from the adversarial customs that define the American legal tradition than do SSA hearings.  In processing disability claims, the ALJs do not simply act as umpires calling balls and strikes.  They are by law investigators of the facts, and are tasked not only with the obligation to consider the reasons offered by both sides, but also with actively developing the record in the case.").

attorney.  The record further shows the claimant was not required audio-logical treatment or underwent testing.  He has worked for years and said he was terminated from his job because he had a cane.  Thus, the undersigned finds the claimant's allegation of deafness is not a medically determinable impairment, as it is not the result of an anatomical, physiological or psychological abnormality, which can be shown by medically acceptable clinical or laboratory diagnostic techniques (20 CFR 404.1508 and 404.1528; Social Security Ruling 96-4p).

(Doc. 5-3, p. 15).

Mr. Hitchcock's medical records support the ALJ's analysis.  Drs. DeBerry and Pukis did not note hearing loss or use of audiological treatment or testing.  (Doc. 5-8, p. 66–72; Doc. 5-9, pp. 19–25).  In December of 2016, Dr. Jampala noted that Mr. Hitchcock had "no tinnitus, no hearing problems."  (Doc. 5-9, p. 16).[6]  And Mr. Hitchcock did not allege hearing impairment in his disability report.  (Doc. 5-7, p. 6).

Mr. Hitchcock's elementary school records show that in 1981, when Mr. Hitchcock was five years old, he received an audiological evaluation.  (Doc. 5-12, p. 5).  This testing showed Mr. Hitchcock's right ear was "borderline normal for 250 and 500Hz, sloping to a mild sensori-neural loss through 2000Hz, and a moderate to severe sensori-neural hearing loss in the higher frequencies."  (Doc. 5-12, p. 5).  His left ear was "slightly poorer in the low frequencies, symmetrical in the highs."  (Doc

---

[6] In 2018, Dr. Vasavada found that Mr. Hitchcock's hearing was poor.  (Doc. 5-15, p. 57).

5-12, p. 5).  Because of these results, Mr. Hitchcock was evaluated with several hearing aids "to meet his amplification needs."  (Doc. 5-12, p. 7).  Given the lack of evidence of hearing loss in Mr. Hitchcock's more recent medical records, his elementary school records do not support his request for an audiological examination.  *Chippini v. Comm'r of Soc. Sec.*, 737 Fed. Appx. 525, 529 (11th Cir. 2018)  (ALJ was not required to consider school district audiologist's recommendations from seven years prior, "which pertained to diagnostic testing accommodations, not to appellant's ability to work").

The ALJ also denied Mr. Hitchcock's request for a consultative examination to determine his functioning IQ, explaining:

> Nine days prior to the hearing, claimant's attorney requested a consultative examination to determine the claimant's [functioning] IQ was necessary, however, he failed to state why it was necessary. Claimant's counsel said records from the Scottsboro City School System when the claimant was 14 years old showed a Verbal IQ of 75 that he alleges was within the requirements of 12.05.  This request was denied for failure to show how the claimant meets or equals any Listing under 12.00.  The clamant [*sic*] returned to school and obtained a GED. He has a driver license and on his Functional Report (Exhibit 4E), the claimant was [driving] a car, went out alone, shops at the store, handles a checking account, savings account and pays bills.  He reads and goes on the Internet 'learning new things and how to do them.'  He has been working for several years albeit at the unskilled SVP2 level.  There is no indication from the claimant's attorney as to the claimant meeting any of the "B" criteria [under] 12.05.

(Doc. 5-3, p. 15).

Mr. Hitchcock did not allege an intellectual impairment in his 2015 disability report. (Doc. 5-7, pp. 7, 9). *See Hethcox v. Comm'r of Soc. Sec.*, 638 Fed. Appx. 833, 825 (11th Cir. 2015) (stating that when the plaintiff "did not allege a mental disability in her disability report," the plaintiff's "testimony about her impairments and [the doctor's] initial report indicating that she had below-average intelligence did not require the ALJ to order a consultative examination"). Mr. Hitchcock's school records establish Mr. Hitchcock's academic grades and his scoring on OLSAT, but the records do not reflect IQ testing. (Doc. 5-11, pp. 9–13, 18–38).

In evaluating an allegation of intellectual disability, an ALJ must consider IQ test results "*and* the medical report. Moreover, IQ test results must be examined to assure consistency with daily activities and behavior. Thus . . . it was proper for the ALJ to examine other evidence in the record in determining" whether Mr. Hitchcock was intellectually disabled. *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986) (citing *Strunk v. Heckler*, 732 F.2d 1357, 1360 (7th Cir. 1984)). Rather, *Popp*, 779 F.2d at 1499 (emphasis in *Popp*).[7]

---

[7] In *Popp*, the Eleventh Circuit noted that the claimant "was close to completing the requirements for a bachelor of science degree and had a history of having taught high school algebra," and "was not alleged to be failing in his college course studies." *Popp*, 779 F.2d at 1499. The ALJ in *Popp* found that those activities were inconsistent with a finding of intellectual disability. *Popp*, 779 F.2d at 1500.

The medical evidence in Mr. Hitchcock's administrative record includes a note from Dr. Vasavada who treated Mr. Hitchcock at Huntsville Hospital in February 2018 after Mr. Hitchcock overdosed.  (Doc. 5-15, pp. 48, 50).  Mr. Hitchcock reported that he lived with his mother and that he could not drive.  (Doc. 5-15, pp. 48, 53).  He reported that he had completed seven years of school, had not been able to work, was not able to afford medication, and might need co-pay assistance.  Dr. Vasavada and the hospital's psychiatric care coordinator noted that Mr. Hitchcock had severe obesity and chronic pain issues, poor judgment, and fair to poor insight.  (Doc. 5-15, pp. 49, 51-55).  Mr. Hitchcock reported visual and auditory hallucinations.  (Doc. 5-15, pp. 50, 54).  Dr. Vasavada indicated that Mr. Hitchcock had a "low" or "borderline IQ."  (Doc. 5-15, p. 55).  He also indicated that Mr. Hitchcock could feed and dress himself independently, but he needed assistance bathing and with functional mobility, computers, and money management. (Doc. 5-15, p. 56).  Dr. Vasavada ranked Mr. Hitchcock as fair in self-control, decision-making, and ability to learn and poor in hearing, balance, physical strength, memory, and ability to follow directions.  (Doc. 5-15, p. 57).

The medical evidence also includes Dr. Davis's August 22, 2016 record which states:  "We talked about the patient's condition with him in terms and language he understands."  (Doc. 5-9, p. 11).  The Court cannot tell if Dr. Davis's note reflects

standard language or if the note suggests that Mr. Hitchcock had some difficulty understanding Dr. Davis's initial instructions.

During his administrative hearing, Mr. Hitchcock testified that he was in special education classes when he was in middle school, (Doc. 5-3, p. 55), but he did not report special education classes in his disability report, (Doc. 5-7, p. 7). He also testified that he was not able to pass his GED test, (Doc. 5-3, p. 51), but his disability report indicates that he obtained his GED in 2001. (Doc. 5-7, p. 7). Mr. Hitchcock worked in a factory for nearly 20 years. (Doc. 5-7, p. 7). The record reflects that Mr. Hitchcock had a driver's license and drove; completed tasks around the house like cooking and vacuuming; shopped in stores, by phone, by mail, and by computer; and paid bills and managed a savings account; (Doc. 5-3, pp. 52, 75; Doc. 5-7 pp. 7, 17–19).

The evidence in the record concerning intellectual disability is inconsistent, but substantial evidence supports the ALJ's finding that he did not have to order an IQ examination for Mr. Hitchcock. *See Mabrey v. Acting Comm'r of Soc. Sec. Admin.*, 724 Fed. Appx. 726, 729 (11th Cir. 2018) (holding that "record contained sufficient evidence for the ALJ to make an informed determination that [plaintiff] did not suffer from an intellectual disability, making further record development unnecessary"); *see also Hickel v. Comm'r of Soc. Sec.*, 539 Fed. Appx. 980, 984 (11th Cir. 2013) (affirming ALJ's finding that applicant did not meet the intellectual

disability listing where the record indicated that the applicant graduated high school, worked part time, drove herself to work, prepared "simple meals," and dressed and groomed herself); *see also Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1269 (11th Cir. 2007) (stating that an ALJ "is not required to order a consultative examination as long as the record contains sufficient evidence for the [ALJ] to make an informed decision").

### *Medical Opinions Under Listing 1.02*

An ALJ must consider whether a claimant's impairment meets or equals a listing. *See Todd v. Heckler*, 736 F.2d 641, 642 (11th Cir. 1984). Under Listing 1.02, a major dysfunction of a joint is:

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> > A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
> >
> > or
> >
> > B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

(20 C.F.R. 404, Subpart P, App. 1).

The claimant bears the burden of producing medical evidence that establishes the required medical findings. *See Bowen v. Yuckert*, 482 U.S. 137, 146 & n.5 (1987). Therefore, the claimant bears the burden of presenting "medical evidence which describes how the impairment" equals the listed impairment. *Bell v. Bowen*, 796 F.2d 1350, 1353 (11th Cir. 1986) (citing 20 C.F.R. §§ 404.1525 and 404.1526). Under 20 C.F.R. § 404.1526(a), to equal a Listing, these "medical findings must be at least equal in severity and duration to the listed findings." *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002) (quotations omitted).

In determining medical equivalence, an ALJ "must consider the medical opinion of one or more designated physicians on an advisory basis." *Wilkinson ex rel. Wilkinson v. Bowen*, 847 F.2d 660, 662 (11th Cir. 1987) (citing 20 C.F.R. § 416.926(b)). The designated physician's judgment on the equivalence of the evidence "must be received into the record as expert opinion evidence and given appropriate weight." *Baker v. Berryhill*, No. 5:17-cv-00921-AKK, 2018 WL 4635741, at *5 (N.D. Ala. 2018) (quoting SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996)). If a claimant has more than one impairment that does not meet or equal a listed impairment, then the ALJ must review "the impairments' symptoms, signs, and laboratory findings to determine whether the combination is medically equal to any listed impairment." *Wilson*, 284 F.3d at 1224.

Here, the ALJ considered the medical opinion of a designated physician on the issue of medical equivalence to Listing 1.02. Dr. Marcus Whitman submitted a signed Disability Determination and Transmittal form. (Doc. 5-4, pp. 2–14). In this report, Dr. Whitman reviewed Mr. Hitchcock's medical records from SportsMED Orthopaedic and Hazel Green Family Practice. (Doc. 5-4, pp. 3–4). Dr. Whitman noted that he considered Listing 1.02 and concluded Mr. Hitchcock was not disabled. (Doc. 5-4, pp. 7, 13).

Dr. Whitman considered the combination of Mr. Hitchcock's three physical impairments of osteoarthrosis; obesity; and disorders of muscle, ligament, and fascia. (Doc. 5-4, p. 7). Dr. Whitman's review of Mr. Hitchcock's medical records shows multiple exam results indicating Mr. Hitchcock was "morbidly obese" and that he used a knee brace and a cane for ambulation. (Doc. 5-4, pp. 10–12). Dr. Whitman found that Mr. Hitchcock's morbid obesity "further limits his functional abilities." (Doc. 5-4 p. 8). Relying on Mr. Hitchcock's medical records as of October 2015, Dr. Whitman concluded that Mr. Hitchcock was not disabled under Listing 1.02. (Doc. 5-4 pp. 12–13).

Dr. Whitman's analysis constitutes a medical opinion by a "designated consultative physician" on the issue of medical equivalency. *Baker*, 2018 WL 4635741, at *6 (stating detailed analyses from doctors who submitted Disability

Determination and Transmittal forms constituted medical opinions by a designated consultative regarding medical equivalency).

The ALJ concluded that Mr. Hitchcock does not have an impairment or combination of impairments that meets or medically equals a listing. (Doc. 5-3, p. 16). He concluded that Mr. Hitchcock's "knee impairment is not of the severity required to meet or equal Listing 1.02;" and the "signs, symptoms, and laboratory findings" of Mr. Hitchcock's obesity "are not of such severity as found in any listing." (Doc. 5-3, pp. 17–18). The ALJ explained that "[c]onsiderable weight [was] given to the opinion of the State agency consultant, Dr. Marcus Whitmann [*sic*], who evaluated the case at the initial determination level and determined [that Mr. Hitchcock] could perform a reduced range of work activity at the sedentary level of exertion. This opinion is consistent with his history of knee and foot pain and with the conservative treatment he has received over a significant period for the moderate pain he has reported." (Doc. 5-3, p. 21). In section five of his analysis, the ALJ discussed the medical records relating to Mr. Hitchcock's degenerative joint disease in his feet, degenerative arthritis of his left knee, osteoarthritis in his right knee, range of motion in his knees, cane use, and obesity. (Doc. 5-3, pp. 19–20).

Substantial evidence in the record supports the ALJ's analysis. Doctors prescribed Mr. Hitchcock an ankle and knee brace and a cane in May of 2015, (Doc. 5-8, p. 6), but with these devices in July 2015, Dr. Culpepper gave Mr. Hitchcock a

work release and restricted him to "light duty work.  No prolonged walking, standing or stairs."  (Doc. 5-12, p. 44).  Mr. Hitchcock's doctors encouraged Mr. Hitchcock to exercise and lose weight.  Mr. Hitchcock's RFC is for "less than the full range of sedentary work" that allows him to use a cane.  (Doc. 5-3, p. 18).

Therefore, substantial evidence supports the ALJ's finding that Mr. Hitchcock does not have an impairment or combination of impairments that meets or medically equals any listing, including Listing 1.02.  *Lewis v. Comm'r of Soc. Sec.*, 487 Fed. Appx. 481, 483–84 (11th Cir. 2012) (affirming the ALJ's conclusion that the combination of claimant's obesity and arthritis when the medical records indicate claimant's health problems do not "amount to a listing-level impairment"); *Baker*, 2018 WL 4635741, at *7 (affirming the ALJ's conclusion that the claimant's obesity, "in combination with her other impairments, does not medically equal Listing 1.04," where the medical records reflect no acute abnormality and only "mild degenerative changes").

## Conclusion

For the reasons discussed above, substantial evidence supports the ALJ's decision, and the ALJ applied proper legal standards. The Court may not reweigh the evidence or substitute its judgment for that of the Commissioner. Accordingly, the Court affirms the Commissioner. The Court will enter a separate final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this April 9, 2021.

_____

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE